# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:18-cr-00258-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE: DEFENDANT GENNADY BABITCHENKO'S MOTION TO REOPEN DETENTION HEARING** |
| vs. | |
| GENNADY BABITCHENKO, | |
| Defendant. | **(Dkt. 218)** |

Pending before the Court is Defendant Gennady Babitchenko's ("Gennady") Motion to Reopen Detention Hearing (Dkt. 218). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. FACTUAL AND PROCEDURAL BACKGROUND

1.     After Gennady's indictment for trafficking and money laundering in mid-August, the Court heard the Government's Motion for Detention on August 28, 2018. (Dkt. 88).

2.     The undersigned found that no set of conditions could reasonably assure Gennady's and the other co-defendants' appearance at trial and detained them as a flight risk under the Bail Reform Act, 18 U.S.C. § 3143(b). (Dkt. 94). Among other things, the Court relied on proffer showing Gennady transferred significant sums of money from the U.S. to Brazil, has traveled on multiple occasions to Brazil, has legal residency status in Brazil, and had said to others that he intended to move to Brazil. *Id*.

3.     In September 2018, Gennady filed an appeal from the detention order before U.S. District Judge Edward J. Lodge. (Dkt. 98). A hearing was conducted, with additional proffer and

argument. (Dkt. 124). On September 25, 2018, Judge Lodge issued a Memorandum Decision and Order denying Gennady's appeal, keeping intact this Court's prior detention order. (Dkt. 128).

4.　　　On October 22, 2018, the Government filed a Motion for Complex-Case Designation Pursuant to 18 U.S.C. § 3161(h)(7)(ii) and Trial Continuance (requesting that trial be reset from October 23, 2018 to October 1, 2019). (Dkt. 134). Although the Government represented in its motion that no defendants objected to a trial continuance, Gennady subsequently did file an objection as to (1) the length of the continuance (seeking instead only a 90-day continuance), and (2) the Government's complex-case designation efforts. (Dkt. 135).[1] That same day, Judge Lodge granted a 90-day continuance and reset the trial date for January 22, 2019. (Dkt. 136).

5.　　　On November 27, 2018, new counsel was appointed to represent Gennady pursuant to the Criminal Justice Act, after prior counsel moved to withdraw. (Dkt. 156).

6.　　　On November 30, 2018, U.S. District Judge B. Lynn Winmill granted the Government's request for complex-case designation, "[g]iven the obvious complexity" of the case, but denied the Government's request for a one-year continuance. (Dkt. 157). Instead, Judge Winmill reset the trial date for June 3, 2019. *Id*.

7.　　　On December 6, 2018, Gennady filed a Motion to Continue Jury Trial or Alternatively, to Withdraw and for Substitution of Counsel, requesting a one-month trial continuance from June 3, 2019 to July 29, 2019, (Dkt. 159). On December 11, 2018, Judge Winmill granted the motion and reset the trial date for July 29, 2019. (Dkts. 161, 162).

8.　　　On January 28, 2019, Gennady filed a Motion for Release Pending Trial, arguing his continued detention violated the Due Process Clause of the Fifth Amendment of the

---

[1] Eight co-defendants eventually followed suit – each objecting to the Government's complex-case designation efforts and any additional trial continuance beyond January 22, 2019. (Dkts. 137-141, 143, 147, 148).

**MEMORANDUM DECISION AND ORDER -- 2**

Constitution of the United States. (Dkt.164). On January 30, 2019, Judge Winmill denied the motion. (Dkt. 166).

9.      On January 31, 2019, Gennady appealed the denial of his motion for release. (Dkt. 167). On March 22, 2019, the Ninth Circuit affirmed, stating in relevant part: "[P]retrial detention in this case has not been excessively prolonged and does not violate due process under the circumstances of this case" and "contentions that anticipated future delays will render [Gennady's] detention unconstitutional are not yet ripe." (Dkt. 192).

10.      On May 15, 2019, the grand jury issued a Superseding Indictment which brought additional charges against Gennady (conspiracy to commit wire fraud, conspiracy to traffic in counterfeit goods, money laundering conspiracy, and money laundering) and correspondingly expanded the scope of the criminal forfeiture allegations. (Dkt. 210).

11.      On May 30, 2019, Gennady filed the at-issue Motion to Reopen Detention Hearing pursuant to 18 U.S.C. § 3142(f)(2), in which he contended that new information had surfaced that was unknown to him at the time of his initial hearing. (Dkt. 218). Among other things, he contended the Government provided incorrect information in its proffer regarding Gennady's alleged plan to move to Brazil. *Id*. He further stated he is not a flight risk and there are conditions or a combination of conditions that would assure his appearance for further court proceedings. *Id.* Though acknowledging the Court was previously persuaded by a preponderance of the evidence that there was no set of conditions that would assure his appearance at future proceedings, Gennady argued that such a conclusion is undercut by the newly-discovered information – namely, that the Government erroneously represented to the Court that he had told others that he intended to move to Brazil. *Id*. Gennady further offers to surrender his U.S. passport and Brazilian residency card to alleviate any flight risk concerns. *Id*.

12. During a June 6, 2019 status conference with Judge Winmill, Gennady and other co-defendants asked for a trial continuance to October 2020, citing their need to investigate this alleged massive conspiracy, which would include: (1) international evidence and witnesses, (2) defense experts, and (3) culling through the huge amount of electronic discovery and physical evidence. (Dkt. 231). On July 19, 2019, Judge Winmill agreed to reset the trial date for October 5, 2020, but continued to stress the need to expeditiously proceed to trial and informed the parties that the trial may be reset again, but on an earlier date. (Dkt. 281).

13. On June 28, 2019, the Court held a hearing on the Motion to Reopen Detention. (Dkt. 256). The Court made certain assessments of the record following the evidence, proffer, and argument, and also informed the parties that the Court was concerned about the due process implications of pretrial detention in this case, given the lengthy period of detention which had already occurred and the even longer period of detention which would occur with an October 2020 trial setting. *Id.*

14. On July 8, 2019, the Court requested a written memorandum from each party (1) identifying the expected trial date (the parties were not in agreement as to the expected trial date at the time of the hearing (*see supra*)); and (2) offering argument on whether the detention to date or continued detention through October of 2020 would violate Fifth Amendment Due Process Clause protections for Gennady. (Dkt. 264).

## II. ALLEGED CHANGES IN CIRCUMSTANCES SINCE THE INITIAL DETENTION HEARING

15. In Gennady's June 28, 2019 hearing on the Motion to Reopen Detention, new information was provided by the Government including additional proffer, stating:

- After being approached by federal investigators, Igor Babichenko – a brother of Gennady who resides in Florida and has been connected with the financial transfers and Gennady's businesses here in Idaho – traveled with family to

Brazil earlier this summer and did not return as scheduled. (Dkt. 268 at p. 36).

- Three people (aside from the person central to the Government's proffer during the initial detention hearing in September 2018) indicated the extended Babichenko family planned to move to Brazil, but the Government said there was no specific information as to whether that specifically included Gennady. *Id*.at p. 30.

- The Government also offered new evidence (Exhibits 6 –21) of emails, financial statements, and labels for iPhones containing identical IMEI numbers. *Id.*

16.     At the same hearing, Gennady provided what his counsel contended was "new" information supporting reconsideration of the prior detention order:

- The proffer the Government relied upon regarding Gennady's intention to move to Brazil during the initial detention hearing in September 2018 was inaccurate and misleading. *Id*. at p. 57.

- Other co-defendants currently out on pretrial release have abided by their release agreement and have not fled. *Id.* at p. 56.

- Since the September 2018 hearing, counsel has had a better opportunity to grasp the discovery and financial information presented, providing a stronger understanding of the case. *Id.*

- Gennady is willing to surrender not only his U.S. passport and Brazilian residency card, but also those of his entire immediate family. *Id.* at p. 54.

17.     On July 19, 2019, as requested by the Court, each party filed a memorandum (1) identifying the expected trial date; and (2) offering argument on the due process concerns raised by the Court at the June 28, 2019 hearing. (Dkts. 282, 283). In these memoranda, each party argues from a three-part analysis based upon applicable case law, as to whether a due process violation exists: "(1) the non-speculative length of expected confinement; (2) the extent to which the Government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *United States v. Aileman*, 165 F.R.D. 571, 581 (N.D. Cal. 1996).

18.    The Government argued:

- The trial date is uncertain, and therefore cannot be considered when calculating the non-speculative length of expected confinement. (Dkt. 283). Regardless, even if the October 2020 trial date wasn't speculative, lengthier detentions have been found not to violate due process in other complex cases. *Id*. at p. 6.

- The complexities of the case are due to the actions of Gennady and the other co-defendants, as they were directly responsible for the complex and lengthy investigations that have produced voluminous evidence resulting in the pretrial delays. *Id*. at p. 7.

- Gennady and other co-defendants sought lengthy continuances, not the Government. *Id*.

- Gennady is a flight risk – he is facing serious criminal liability and financial activity suggests he has plans to relocate to Brazil. *Id*. at p. 10. Similarly, his brother Igor fled to Brazil at the end of June 2019, after being approached by the FBI. *Id*.

19.    Gennady argued:

- Gennady has been detained for 11 months and by October 5, 2020, he will have been detained for over 25 months, which is a due process violation. (Dkt. 282 at p. 3).

- The delay in this case is attributable to the Government since it was the Government who sought to designate this case as complex. *Id*. at p.6. The Government is also responsible for the delay due to their inability to turn over complete discovery to date. *Id*.

- Pretrial detention is no longer justified as there are conditions, or a set of conditions, that will reasonably assure his appearance at further court proceedings. *Id*.

- Gennady's detention has and will continue to present a host of serious impediments to Gennady's ability to review discovery and assist counsel, therefore implicating his Sixth Amendment rights. *Id*. at p.7.

### III.    <u>LEGAL FRAMEWORK</u>

Congress enacted the Bail Reform Act to give courts "adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released" or pose a risk of flight, and thus governs a court's decision about whether to release an

arrestee pending trial. *United States v. Salerno*, 481 U.S. 739, 742 (1987). The Speedy Trial

Act accommodates delay caused by an unusually complex case by recognizing that an ends-of-

justice delay may be appropriate when:

> the case is so unusual or so complex, due to the number of defendants, the nature
> of the prosecution, or the existence of novel questions of fact or law, that it is
> unreasonable to expect adequate preparation for pretrial proceedings or for the trial
> itself within the time limits established by this section.

18 U.S.C. § 3161(h)(7)(ii). A case is sufficiently complex when it involves multiple defendants,

multiple counts of complex wire-fraud charges, voluminous discovery, and witnesses from both

within and outside the judicial district. *See United States v. Butz*, 982 F.2d 1378, 1381 (9th Cir.

1993). Therefore, application of the complex-case time frame under the Speedy Trial Act will

sometimes lengthen the period of pretrial detention of a defendant.

   The substantive due process constitutional infirmities of pretrial detention emerge if

detention is punitive rather than regulatory. In *Salerno*, the Supreme Court ruled that the Bail

Reform Act is unmistakably a regulatory response from Congress as to those types of criminal

cases (and those criminal defendants) who properly should be detained before trial for the

purpose of preventing danger to the community – a response which included particular details as

to the process by which such a decision would be made and supported. *Salerno*, 481 U.S. 739,

746-52. Those "process" details of a hearing – an opportunity for the defendant to be heard; for

counsel to present evidence, proffer, and argument; the burden upon the Government to prove

that detention is required; and the steps that must be taken by the court to justify an order of

detention – all pertain as well to whether procedural due process guarantees are satisfied. *Id*. at

750-53.[2] The Court summarized its holding on the due process issues in this manner:

---

[2] Procedural due process requires that "[w]hen government action depriving a person of
life, liberty, or property survives substantive due process scrutiny, it must still be implemented in
a fair manner." *Salerno*, 481 U.S. 739, 746 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335
(1976)).

In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception. We hold that the provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception. The Act authorizes the detention prior to trial of arrestees charged with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel. The numerous procedural safeguards detailed above must attend this adversary hearing. We are unwilling to say that this congressional determination, based as it is upon that primary concern of every government—a concern for the safety and indeed the lives of its citizens—on its face violates either the Due Process Clause of the Fifth Amendment or the Excessive Bail Clause of the Eighth Amendment.

*Id*. at 755.[3]

Hence, as a general matter, the Bail Reform Act itself withstands a due process challenge analysis. Nonetheless, relevant here, the Court in *Salerno* went on to say that "[w]e intimate no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." *Salerno*, 481 U.S. at 747, n.4. The Ninth Circuit Court of Appeals, along with certain other Circuits, "requires assessment on a case by-case basis" in order to determine whether pretrial detention amounts to a due process violation. *United States v. Gelfuso*, 838 F.2d 358, 359 (9th Cir. 1988) (citing *United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2nd Cir. 1986)). On that score, courts "have tended to focus principally on three factors: (1) the non-speculative length of expected confinement; (2) the extent to which the government (the prosecution and/or the court system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *Aileman*, 165 F.R.D. at 581.

## IV.    DISCUSSION

**A.    The Alleged Changes in Circumstances Since the Initial Detention Hearing, Without More, Do Not Warrant a Departure From the Court's Previous Detention Order(s)**

---

[3] There is no Eighth Amendment challenge at issue here, and if there was it would almost certainly be found lacking given the holding in *Salerno*.

Gennady first seeks pretrial release based upon allegedly-changed circumstances from the date of earlier detention hearings. However, the changed circumstances described by his counsel are almost in their entirety *not* changed circumstances from those put before the Court at his original detention hearing. The exception involves a proffer made by the Government at the original hearing at which the Government contended a cooperating witness had heard Gennady say he intended to leave the U.S. for Brazil. The Government has since said that the statement about leaving the U.S. for Brazil was more generalized when made by the cooperating witness and could not be tied specifically to Gennady. Otherwise, the purported changed circumstances were more in the nature of a description of the impacts of his continued lengthy detention upon his family, upon his ability to assist his counsel in the preparation of his defense, and in the form of suggested conditions for release.

Hence, the most salient of the underlying circumstances which previously gave rise to the detention order remain unchanged, and the proposed additional conditions (such as surrender of the family members' passports and any Brazilian residency cards they may hold) do not tip the balance in favor of release solely under application of the 18 U.S.C. § 3142(g) factors. Further, the weight of the evidence supporting the alleged charges against this Defendant was enlarged upon by the Government at the hearing, lending some additional credence to the Government's previous argument regarding the seriousness (and volume) of the alleged crimes. As described from the bench at the conclusion of the most recent hearing, the sum of Gennady's proof and argument did not persuade that Court that there were changed circumstances sufficient to support a different decision under the Bail Reform Act. Drawing upon the record that had been previously established and the evidence and new argument made by his counsel, the Court was satisfied by a preponderance of the evidence that Gennady is a risk of not appearing for further proceedings and no conditions can be imposed which will reasonably assure his appearance at

further proceedings. But, that decision and the Court's further assessment of it in the most recent proceedings, is based upon provisions of the Bail Reform Act, and does not consider the tension between the Bail Reform Act and the Fifth Amendment's Due Process Clause, which is discussed to follow.

**B.     Constitutional Considerations:  Gennady's Continued Pre-Trial Detention Has Transitioned From Regulatory to Punitive In Nature**

Alternatively, Gennady contends that his detention – which has already continued for approximately 11 months – violates Fifth Amendment substantive due process protections. Ancillary to that claim is his argument that his Sixth Amendment right to assist in his defense is already compromised (or, even if not yet compromised at this point, certainly will be violated if he is required to remain in custody, which, he points out, will continue until at least October 2020 if the current trial setting holds). His arguments in this regard focus upon the practical difficulty with assisting his attorney from jail in reviewing and evaluating the enormous amount of electronic and other information seized by the Government from Gennady and his co-defendants, which is the great bulk of discovery in this case along with the investigative reports from the various federal law enforcement agents working on the case.

This is an unusual case, but by no means unique, in the world of federal felony white-collar crime prosecutions when it comes to the volume of material turned over by the Government.[4] The amount of "information" makes defending the case more daunting, but not

---

[4] Gennady contends, and the Government does not contest, that not all discovery has been produced to date. The Government, however, contends and the Court is satisfied on the current record that the great bulk of such discovery has been produced. Of significance as well is the fact that a discovery master has been employed by order of Judge Winmill. That person is experienced in handling large volumes of electronic and other evidence in complex cases and some of the delay in getting the discovery into the hands of defense counsel is due to the work being done by the discovery master. Ultimately, however, the discovery master's work will make the work of defense counsel more efficient and much faster than if they had to digest and organize such information on their own.

**MEMORANDUM DECISION AND ORDER -- 10**

impossible, for both defense counsel and his client (the same is true, of course, for the Government). The fact that a client is in custody pending trial is also a challenge, and ordinarily requires finding the best possible avenue to obtain the assistance of the client, notwithstanding his or her detention, and the best possible avenue for counsel and/or counsel's assistants or experts to communicate with the client regarding the same.

However, the nuances of those Sixth Amendment concerns come into play when combined with the protections of the Fifth Amendment's Due Process Clause, which is also implicated in Gennady's current circumstances and which is an additional potential reason for release. The due process issue has arisen because of the length of detention to date, and the additional period of detention between now and the October 2020 trial setting, raising the question of whether that length of detention alone or if combined with the present expectation of additional detention into October 2020 tips the balance such that his detention has become or will become punitive, rather than regulatory, in nature.

In January of 2019, Gennady previously made a due process challenge to his continued detention. After being turned down by the district judge, the Ninth Circuit also ruled against Gennady in March of 2019, which included a statement that "anticipated future delays will render [Gennady's] detention unconstitutional are not yet ripe." (Dkt. 192).

The Government might well contend that even though Gennady has been detained an additional seven months since that challenge was made, any claim that the length of his detention violates his due process rights is still not yet ripe. But such an argument, at least in the context of this case, creates an impossible Hobson's choice for a defendant. At what point does his detention cross the line – 15 months, 18 months, two years? What about the time it takes for the courts to consider his claim, at which point, if the Court was to agree that his detention had gone on too long, he would then have not only been detained past the point at which the Constitution

would say his due process rights had been violated, but for an even longer period of time on top of that. Gennady has been in custody for nearly a year and faces the prospect of incarceration as a pretrial detainee for another 14 months and perhaps longer. His claim may not be dropping off the tree, but it is certainly ripe in those circumstances.

Hence, there is good reason for the Court to consider the due process implications of Gennady's continued detention pending trial, and whether his detention has become punitive in nature and no longer consistent with the regulatory purpose of Congress in enacting the Bail Reform Act. The issue is a straightforward one; its resolution not so much. It asks whether, in a pretrial setting where a defendant is entitled to the presumption of innocence and the tilt of the table is for pretrial release as provided by the Constitution and framed by the Bail Reform Act, is the fact of an 11-month detention period to date, and an expected additional period of detention until a trial date in October of 2020 (for a potential total period of *more than two years* in *pretrial* detention), too much?[5]

The U.S. Supreme Court, the Ninth Circuit, and other federal courts who have written upon the Due Process Clause concerns raised by a lengthy pretrial detention have emphasized the very case-specific nature of such an inquiry. The Ninth Circuit "requires assessment on a case-by-case basis" in order to determine whether pretrial detention amounts to a due process violation. *Gelfuso*, 838 F.2d at 359 (citing *Gonzales-Claudio*, 806 F.2d at 340). A sensible application of that case-by-case assessment was conducted in *Aileman*, 165 F.R.D. 571. There, the trial court examined the various decisions of the higher courts and concluded that the decisions "have tended to focus principally on three factors: (1) the non-speculative length of expected confinement; (2) the extent to which the government (the prosecution and/or the court

---

[5] This calculation does not include the time of detention during the trial itself, which appears likely will be a trial of some weeks rather than some days.

system) bears responsibility for pretrial delay; and (3) the strength of the evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community." *Id*. at 581.

The issue also involves the interplay between the Speedy Trial Act and due process issues raised by lengthy pretrial detention – after all, as a general matter, if a defendant goes to trial within the time period ordinarily required under the Speedy Trial Act, then it is very unlikely that there could be any due process issues with that defendant's detention pending trial. Indeed, the Government seems to argue that the fact that the prior trial date continuances in this case are deemed to be "excludable" time under the Speedy Trial Act, which should be dispositive of the question of whether Gennady's due process rights are compromised. That argument draws in part upon the statement in *Salerno* that the "the maximum length of pretrial detention is limited by the stringent time limitations of the Speedy Trial Act." *Salerno*, 481 U.S. at 747.

Hence, there is a bright line drawn by the outer trial date boundaries of the Speedy Trial Act. However, due process violations stemming from pretrial detention can still arise even when trial dates are continued for lengthy periods of time beyond the usual six-month measure using "excludable time" under application of the Speedy Trial Act. As noted earlier, the *Salerno* court made no holding "as to the point at which detention in a particular case might become excessively prolonged and therefore punitive, in relation to Congress' regulatory goal." *Id*. at 747. This is a case that now raises that question – in other words, is this a case in which Gennady's detention has become and will continue to be excessively prolonged and therefore punitive, *notwithstanding* the fact that the delays which have pushed the trial to a date more than two years after the first Indictment was brought are deemed excludable time under the Speedy Trial Act?

That brings the Court to the *Aileman* factors (drawn from Circuit decisions considering similar challenges) as applied to this case, along with the factors employed in the Bail Reform

Act. The first *Aileman* factor asks what is the "non-speculative length of the [Defendant's] confinement?" Gennady's confinement has been nearly a year in length already and will exceed two years by the time of the current trial setting. The Government argues that there is speculation as to whether the trial will be held at that time, as Judge Winmill has held out the possibility that a trial may be held *earlier* than October 2020. However, the trial is *set* for October 2020. It is not a circumstance where there is no trial setting and the parties are speculating as to what the trial setting might be. Discovery (although apparently mostly complete) is not fully complete, and considerable effort will be needed to study and make sense of the information (for both sides of the case) before trial. The case involves multiple defendants and a myriad of charges, with one Superseding Indictment already filed. There will be, no doubt, pretrial motions, perhaps some involving evidentiary issues, all of which (particularly in this case) will require considerable time and effort from the parties and the Court. Against that backdrop, the Court concludes that even though the October 2020 trial is not set in stone, it is more likely than not that the trial will be held at that time rather than earlier on.

The second *Aileman* factor concerns the Government's (the prosecution and/or the court system) role in any pretrial delay. In this case, fingers point to all quarters, so to speak. There is likely some element of the court system's connection to the delay, because the dockets (both criminal and civil) are enormously overburdened in the District of Idaho. However, Judge Winmill is well-known for his consistent and concerted efforts to move cases as quickly as possible, on both dockets. Further, Judge Winmill has designated this as a "complex case" for Speedy Trial Act purposes, which recognizes that the size (as to defendants, claims, evidence and nature of the case generally) of the case justifies a period to time to trial which exceeds that ordinarily permitted under the Speedy Trial Act. Finally, the Government spent several years investigating this case before bringing an Indictment (and then a Superseding Indictment);

executed multiple search warrants as part of that investigation; seized dozens of computers and other electronic storage devices from businesses and other locations associated with the defendants and their businesses; and seized (as the Government has frequently emphasized) thousands of alleged counterfeit or otherwise illegal goods at multiple warehouse locations connected to the defendants.

Gennady points to the investigation conducted by the Government and the amount of information and tangible property seized by the Government to argue that the second factor weighs against the Government. However, the scope of the investigation and the enormous volume of the seized goods and electronic information are arguably just as much a product of the *defendants'* conduct – in other words, it is the allegedly illegal conduct of the defendants (to include Gennady) traversing multiple international boundaries (electronically and in person), arranging the manufacture of enormous amounts of counterfeit electronic goods, conducted through dozens of business entities under suspicious circumstances, and utilizing the deposit and transfer of significant sums of money over a period of years, all of which the Government contends were the result of illegal activity. It is inescapable that such activities –whether illegal or legal—would create the mountain (or morass) of potential evidence that the defendants, their counsel, and the Government are all dealing with now, and which at some point the Court will be dealing with as well. In that setting, this factor can be equally assessed against the defendants as against the Government.

The final *Aileman* factor considers the strength of any evidence indicating a risk of flight, a threat to the trial process, and/or a danger to the community. It is this factor which ultimately determines the due process issue for Gennady, in that the other factors do not weigh strongly in favor of Gennady or the Government. Hence, the Court has reconsidered the nature of the evidence offered and the arguments made at the time of the original decision to detain Gennady

and has added to its consideration the further unfolding of this case (pertinent to this issue) as described above. The Court's prior decision was, as Gennady mentions in his briefing, a "close" one. The question was whether there existed a set of conditions that would reasonably assure Gennady's presence at future proceedings, which the Court was persuaded at the time had been proven by the Government to *not* be possible. However, this is not a case in which a detained defendant is argued to be a risk to national security, involved in organized crime involving murder conspiracies, or implicated in terrorist activity, as was at play in other reported decisions rejecting due process challenges to length of detention. There is some suggestion from the Government that there is a potential threat to the trial process if Gennady were to be released, but as has been recounted at great length in the parties' briefing and in this Decision, the Government has already gathered enormous amounts of information and conducted years of investigation which led to the filing of the Indictments in this case. That is "water under the bridge," the great bulk of which can't be tampered or interfered with at this time.

That leaves the risk of flight, a concern described by this Court in the original order of detention, and a concern reiterated in the decisions reviewing that order. Under the Bail Reform Act, the Court considers the Section 3142(g) factors to decide whether there are conditions of release that "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g). The Court considers the nature and circumstances of the charges, the weight of the evidence supporting such charges, the defendant's history and characteristics, and the nature and seriousness of the danger to any person or the community if the defendant is released. *Id*. Of importance here, when considering the Bail Reform Factors in the context of a substantive due process analysis, there is no compelling evidence that the Defendant would pose a danger to any person or the community if released. The crimes alleged are property crimes – alleged to be of considerable magnitude, the

Court acknowledges, but property crimes nonetheless – and the alleged victims have suffered

financial losses, not injuries or death or the threat of the same.[6]

Courts also have made special note that the justification for detention in the face of a due

process challenge over the length of pretrial detention is far more compelling when detention is

based upon a serious risk of danger to any person or the community, than if detention is based

upon a risk of non-appearance. *See Oreana*, 986 F.2d at 631 ("[T]he constitutional limits on a

detention based on dangerousness to the community may be looser than the limits on a detention

period based solely on risk of flight. In the former case, release risks injury to others, while in the

latter case, release risks only the loss of a conviction."); *accord*, *El-Hage*, 213 F.3d at 80. This

distinction between cases in which detention is sought based on risk of flight, not risk of danger,

also was described in *Salerno* – the case in which the Supreme Court upheld the constitutionality

of the Bail Reform Act. There, the Court said:

> The only arguable substantive limitation of the [Excessive] Bail Clause is that the
> Government's proposed conditions of release or detention not be "excessive" in
> light of the perceived evil. Of course, to determine whether the Government's
> response is excessive, we must compare that response against the interest the
> Government seeks to protect by means of that response. Thus, when the
> Government has admitted that its only interest is in preventing flight, bail must be
> set by a court at a sum designed to ensure that goal, and no more.

*Salerno*, 481 U.S. at 754 (internal citations omitted).

---

[6] This is one of several details which distinguish this case from reported decisions which
have ruled that an extended period of pretrial detention does not violate the Due Process Clause
of the Fifth Amendment. *See, e.g., Salerno*, 481 U.S. 739 (defendants were deeply involved in
operation of La Cosa Nostra family, with charges including conspiracy to commit murder);
*Gelfuso*, 838 F.2d 358 (defendant charged with conspiracy and attempt to distribute cocaine and
distribution of cocaine, in addition to racketeering and loansharking); *El-Hage*, 213 F.3d 74
(defendant charged with, among other counts, six conspiracies to murder U.S. citizens and
destroy property of United States abroad, alleged to be key participant in Bin Laden terrorist
organization); *United States v. Oreana*, 986 F.2d 628 (2d Cir. 1993) (RICO charges based upon
predicate acts of murder, conspiracy to murder, loansharking, and illegal possession of
weapons.).

Finally, the Court considers these factors against the essential Constitutional core of the issue, which is the matter of due process. Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" Salerno, 481 U.S. at 746 (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). Procedural due process then requires that "[w]hen government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner." *Id*. (citing *Mathews*, 424 U.S. at 335).

What does that require here, for Gennady? On balance, when weighing the competing interests of Gennady and his due process rights against the interests of the Government as reflected in the Bail Reform Act, the Court concludes that Gennady's substantive due process rights on the present facts of this case, having already been in custody in pretrial detention for nearly a year, and facing continued pretrial detention to exceed more than two years, must hold sway. The punitive feel of keeping a defendant incarcerated for that length of time in a pretrial setting where he is presumed innocent under our Constitution, is apparent on its face. It is even more compellingly so in Gennady's circumstances, in a setting where his criminal record is a blank slate and his contacts to the community are extensive, as found in his businesses, his family, and his ecclesiastical responsibilities.

The single most concerning aspect of Gennady's background in regard to whether his circumstances support a finding that even a multi-year pre-trial detention remains a regulatory measure rather than a punitive act, is the risk of flight to Brazil given his contacts to that country and the nature of certain of his alleged prior business and financial dealings. But again, the contention that extended detention constitutes a due process violation is to be evaluated upon its own facts, as the Court has described above. And, the Court considers the other differences between a Bail Reform Act decision from evaluation of a potential substantive due process

violation, such as the fact that this is not a case alleging a serious risk of danger to a person or the community, but rather a risk of flight, and therefore the due process concerns take on a heightened importance.

Evaluating this due process challenge on its own facts should also emphasize the entirety of Gennady's life circumstances. Here, Gennady's world before being charged in this case included his denturist company, which his defense counsel described as a successful small business with multiple employees and customers in which he has the responsibilities of someone who crafts the denture products, is the employer of the employees, and is a point of contact for customers. It also included his responsibilities to a church congregation, as to which he had recently been named pastor and as to whom he presumably had the myriad of responsibilities of a pastor to his congregants. Finally, it included a large family, with a wife and young children as to whom he has the responsibilities of husband and father. In each of those facets of his life, Gennady would have reason to draw upon the rights of "life, liberty and the pursuit of happiness." That statement in the Declaration of Independence is among the wellsprings of the Bill of Rights and their protections of life and liberty. Hence, even though the most obvious example of liberty in considering the protections of substantive due process in criminal proceedings is freedom from the restraint of imprisonment, there is more to the meaning of liberty under the frame of the Constitution. Liberty includes not just freedom from restraint, but other fundamental elements of our daily lives as well.

This full meaning of liberty has been part of our jurisprudence since the earliest years of our Republic. It was described (and its historical anchors in the law summarized) by the Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390 (1923), a case which considered the meaning of "liberty" as that word is used in the Fourteenth Amendment, which reads in pertinent part: "No state shall…deprive any person of life, liberty, or property, without due process of law…." In

*Meyer*, the Court said that "[w]hile this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration…" and went on to say:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399 (citations omitted).

Consider how the template placed by the Supreme Court in *Meyer* illustrates exactly how Gennady's liberty already has been abridged, and why continued detention has turned from regulatory to punitive. Each of the areas of his daily life – his business, his family, his religion, and his ability to "enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness" have been taken away from him. *Id.* Significantly, his absence also deprives many others from being fully involved in such activities of their own. He has been absent from his place of business, and therefore also from the employees and clients of that business. He has been absent from his church and his duties as the pastor of that church, and therefore also from the congregants who had chosen him to lead that church. He has been absent from his family, his wife and young children, and therefore also absent from fulfilling the role of husband and father.

That such parts of a daily life are not just quotidian but rather are essential to life and liberty needs no legal citation in the country in which we live. It is enough that we recognize immediately the importance of such things in our own lives, and can therefore recognize their importance in the lives of others, including the life of a person whose detention may have been proper under the Bail Reform Act, but is no longer proper under the Constitution when that detention leaves not just a mark, but rather a profound wound, in the life and liberty of a presumptively innocent person.

**MEMORANDUM DECISION AND ORDER -- 20**

The Court need not decide the exact day that Gennady's pretrial detention turned punitive in nature, other than to declare that it has occurred by now, having been incarcerated for more than 11 months already and facing the bleak prospect of another 14 months or longer in custody, absent an order from this Court ordering that he be released and thereby bring a stop to the unraveling of the due process protections that the Constitution guarantees to him.

Accordingly, the Court will order that Gennady be released from custody, pending further proceedings, on conditions. However, the Court will *not* allow such release until after a hearing has been conducted to hear from Gennady's counsel, counsel for the Government, and the pretrial services office upon the details of appropriate conditions of release, which remain an appropriate use of the Bail Reform Act so long as such conditions do not create the functional equivalent of detention. An order will be forthcoming setting such a hearing, which will take place in the near future.

DATED: July 26, 2019

Ronald E. Bush
Chief U.S. Magistrate Judge